Estate of Maurice J. Lydon, Deceased, George Mullen, Administrator v. Commissioner.
Estate of Maurice J. Lydon v. Commissioner
Docket No. 25221.
United States Tax Court
1952 Tax Ct. Memo LEXIS 34; 11 T.C.M. (CCH) 1119; T.C.M. (RIA) 52331; November 20, 1952
Ralph H. Schuette, Esq., 721 Citizen Savings Bank Bldg., Paducah, Ky., and Aubrey E. Boyd. Jr., Esq., for the petitioner. Lyman G. Friedman, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding involves the following deficiencies in income tax and fraud penalties: Year
Deficiency
Penalty
1941
$1,881.09
$ 940.55
1942
3,678.12
1,839.06
1943
8,067.18
3,971.07
1944
9,171.40
4,585.70
1/1/45 to 10/9/45
8,932.50
The *35 respondent determined the net income of the decedent for the taxable periods from increases each year in net worth. The issues raised by the petitioner are whether the net income, so computed, is correct and whether assessment of the deficiencies is barred by the statute of limitations. Respondent alleged in his answer that the returns filed for the taxable years 1941 to 1944, inclusive, were false and fraudulent with intent to evade tax. The returns for the taxable periods were filed with the collector of internal revenue for the district of Kentucky. Findings of Fact The stipulated facts are so found. Petitioner is the duly qualified administrator of the Estate of Maurice J. Lydon, who died October 9, 1945, a resident of Paducah, Kentucky. The decedent filed his income tax returns for the calendar years 1941 to 1944, inclusive, on or before March 15 of the succeeding year. The return for the taxable period ended October 9, 1945, was filed by petitioner on or before March 15, 1946. All of the returns were filed on the cash basis. On November 10, 1948, petitioner and the Commissioner executed a consent extending to June 30, 1950, the time within which to assess any deficiency *36 in income tax for the calendar year 1945. The notice of deficiency for the taxable periods was mailed on July 7, 1949. The decedent, born in 1895, started to carry newspapers when he was 11 years of age. He obtained his first full-time employment in 1910 or 1911, when he was employed by a chain grocery store. By 1918 he had worked at the Kentucky Theatre, operated a lunch room and worked in, or otherwise was associated with a tavern, all in Paducah. From 1918 until 1928 the decedent was employed by Luther Graham, who operated the 222 Cigar Store in Paducah. The business of the store was wholesale and retail sale of cigars and the operation of a baseball pool, which consists of a raffle for a percentage of the take, without any possibility of loss to the store. Some time between 1923 and 1926 Tom Settle started to keep a handbook on horses. In 1926 or 1927 he commenced to conduct a race horse handbook at 130 Broadway, Paducah, where Graham was also conducting a business similar to the 222 Cigar Store. Of the profits of the handbook operations, Graham and Settle received 40 per cent each, and the decedent, who remained and took bets at the 222 Cigar Store place of business, the *37 remaining 20 per cent. On January 18, 1928, Settle and the decedent purchased for about $3,000 the interest of Graham in the business being conducted by him at 130 Broadway, and thereafter until the death of the decedent they operated the business as equal partners under the trade name of Smoke Shop. The decedent paid actual cash for his share of the cost of the business. The business consisted of the sale of tobacco products, baseball pools or tip boards, and the operation of a race horse handbook. The baseball pools or tip boards contained 120 tickets, which were sold for 10 cents each. The partnership paid out $10 on each full board. After about one year the net profit from the baseball business was about $750 a month. The handbook operations of the partnership had two parts, known as the telephone or credit business and the cash play. Settle worked upstairs in a locked room where he took bets over a telephone and handled "layoffs" [1] with out-of-town bookmakers. The decedent handled the cash or house play downstairs, which was safer and more profitable than the telephone or credit business. The decedent devoted all of his time to the affairs of the partnership. *38 The Smoke Shop kept four sets of records in memorandum books for its business. The decedent kept three of them, one for the tobacco business, one for baseball business, and another for cash handbooks made by him. The other set was maintained by Settle for the so-called phone play. The memoranda for the handbooks consisted of separate entries each day for wins and losses and expenses, and a balancing figure for the operations of the week. A short time after the organization of the partnership, liens were filed against bank accounts of the partners in connection with a suit filed to recover money lost on bets placed with the partners. Promptly after the suit was settled the partners opened a secret [2] bank account. The practice was discontinued in 1941 when a regular account was opened. The partnership account had a balance of $1,269.64 at the close of 1940. The practice of decedent was to carry large sums of money on his person. The partnership lost in excess of $10,000 one *39 day prior to 1940. On other occasions as much as $2,000 was lost in a day. The decedent paid his one-half share of losses in cash, generally in fifty and one hundred dollar bills. The gambling business conducted by the partnership could not be operated without large sums of money. The decedent was industrious, economical, never owned an automobile and never married. He maintained a safe deposit box continuously from January 1, 1936, until his death, and had a box at the same bank for some undisclosed time prior thereto. The decedent's father died in 1914. Thereafter decedent lived with and supported his mother until her death in 1926 or 1927. During 1928 and 1929 the partnership purchased the following stock: 20 shares of Fox Film Corporation. [3] 20 shares of Studebaker Corporation. [3] 40 or 50 shares of Utility Power and Light Co. [3] 20 shares of Warner Bros. [4] 25 shares of Houdaille-Hershey. [4] 10 shares of City Service Co. [4]
During the years 1928 to 1936, inclusive, and 1939 and 1940, the decedent paid a total of $965.87 in income taxes, *40 the amount paid each year being equal to the income tax that would have been payable by a single person without dependents on net income aggregating $42,704.29 for the entire period. The collector of internal revenue at Louisville, Kentucky, has no record of assessments against or income tax returns filed by the decedent for the years 1920 to 1927, inclusive, and 1937 and 1938. After the death of decedent the interest he had in the assets of the partnership was sold to the surviving partner. The returns of the partnership and petitioner were prepared by a certified public accountant from information furnished by the partnership and petitioner with the exception of the return for 1945, which was prepared by the accountant from books and records of the partnership. The income tax returns filed for the taxable years contained the following items of gross income and deductions: 1941
1942
1943
1944
1945
Dividends
$ 60.00
$ 60.00
$ 60.00
$ 60.00
Interest
350.00
88.00
$ 770.00
Annuities 3% of Cost
120.00
120.00
120.00
120.00
120.00
Smoke Shop
2,447.61
4,326.36
5,120.42
6,979.02
5,114.48
Rents
19.16
92.25
15.99
48.49
Capital loss
(1,000.00)
(1,000.00)
(1,000.00)
Total
$2,977.61
$3,613.52
$4,392.67
$6,175.01
$6,052.97
Deductions
(Total)
64.67
135.51
205.01
500.00
500.00
Net income
$2,912.94
$3,478.01
$4,187.66
$5,675.01
$5,552.97
*41 Prior to the examination in April 1948 of the income tax returns of the decedent for the taxable years the records of the decedent concerned with the returns had been partially destroyed. The net income of the decedent for the taxable years was computed by the respondent from a determination of the increase in his net worth during each year. His computation of net income in excess of the amount reported was as follows: 12/31/1940
12/31/1941
12/31/1942
12/31/1943
12/31/1944
12//31/1945
1. Checking account
$ 200.11
$ 216.39
$ 845.94
$ 3,911.97
$ 5,194.35
$ 5,682.93
2. Cash, safe deposit
box
8,043.68
10,126.90
8,285.05
15,181.96
32,042.00
3. Gold coin
141.25
141.25
141.25
141.25
141.25
141.25
4. Cash in pocket
1,530.00
5. Shares in Building
Ass'n.
$10,200.00
$10,200.00
Mortgage notes and
real property re-
ceived in 1942 in ex-
change for Building
Ass'n shares
6. Notes
$ 5,074.85
$ 4,700.15
$ 4,323.19
$ 3,991.54
7. Real property
2,000.00
2,000.00
2,000.00
2,000.00
8. U.S. Treasury bonds
1,500.00
11,750.00
30,500.00
39,250.00
40,000.00
9. Uncashed coupons
on U.S. bonds
275.45
845.00
1,207.50
10. 10 shares Ky. Utili-
ties
1,105.00
1,105.00
1,105.00
1,105.00
1,105.00
1,105.00
11. 18 shares Lincoln
Power Corp.
1.00
1.00
1.00
1.00
1.00
1.00
12. 6 shares Studebaker
Corp.
176.25
176.25
176.25
176.25
176.25
176.25
13. 1 diamond ring
75.00
75.00
75.00
75.00
75.00
75.00
14. 1/2 interest 214
Broadway
3,750.00
3,750.00
15. Cash due from part-
nership
3,291.70
16. 1/2 interest 14 shares
Studebaker Corp.
205.63
205.63
205.63
205.63
205.63
205.63
17. 1/2 interest partner-
nership bank account
347.72
761.55
374.73
816.33
Total assets and net
worth
$12,104.24
$22,011.92
$32,263.37
$51,751.48
$73,064.96
$95,199.80
Increase net worth
during year
$ 9,907.68
$10,251.45
$19,488.11
$21,313.48
$22,134.84
18. Life insurance
571.43
571.43
571.43
571.43
571.43
19. Federal income tax
paid
79.49
164.64
1,072.24
1,169.01
299.25
20. Living expenses
1,800.00
1,800.00
1,800.00
1,800.00
1,395.00
21. Return annuity pol-
icy
(44.00)
(44.00)
(44.00)
(44.00)
(33.00)
22. Capital transactions
2,050.00
(657.50)
Net income
$12,314.60
$14,793.52
$22,230.28
$24,809.92
$24,367.52
Net income reported
2,912.94
3,478.01
4,187.66
5,675.01
5,552.97
Discrepancy
$ 9,401.66
$11,315.51
$18,042.62
$19,134.91
$18,814.55
*42 The discrepancy each year was treated as unreported income in respondent's determination of the deficiencies for the taxable years. The amounts shown in the last column of the asset statement agree with the values reported in the estate tax return, with the following exceptions: The real property in item 7 was returned at a value of $1,150. The figure of $2,000 used by the respondent was the amount for which the parties now agree the property was listed for sale. Item 10 was returned at a value of $1,100. Item 15 was not reported as such. It includes the amount of $1,530 in item 4 and $1,494.14 for stock of Warner Bros., Houdaille-Hershey and City Service Company held by the partnership. The parties have stipulated that the amounts in items 1, 4, 5, 6, 8, 9, 14, 17, 18 and 20 are correct. They also stipulated (1) that the decedent had a total of $32,183.25 in cash, including coin, in his safe deposit box at the time of his death; (2) that the stock listed in item 10 was acquired by decedent in 1926 at a cost of $959.58; (3) that at the time of his death decedent held the stock listed in items 11, 12 and 16, and a diamond ring which he owned prior to December 31, 1940; (4) that *43 except for a duplication of $1,530, the amount in item 15 is correct; and (5) that the amounts in item 19, excluding 1945, are correct. The amount of $299.25 in 1945 constitutes a credit allowed by the collector. The basis for the computation is a net worth statement prepared by a revenue agent in the course of his examination in 1948 of income tax returns of decedent for the taxable years and the estate tax return of his estate. He used the estate tax return as a basis for the statement. The revenue agent did not examine any of the original records of the partnership and could not recall whether he inquired about the existence of such records. He included the total cash of $32,183.25 in decedent's safe deposit box in net worth for 1945. Thereafter a conferee of the Bureau of Internal Revenue included the gold coins in the starting net worth and allocated the other cash as set forth in the statement so that all of the tax on the amount would not occur in one year. At the close of 1940 the decedent held a bond of the Paducah Ice Company of the par value of $500. The decedent received $500 in 1942 on redemption of the bond. In 1932 the Greystone Hotel issued one of its bearer bonds, *44 face amount $1,000, to the decedent. The bond was redeemed on maturity in 1942. The decedent possessed the following securities, notes and papers, among other property, at the time of his death: $10,000 face amount bearer bonds of Illinois Electric Limestone Company, bearing the date of January 1, 1931. The company ceased to exist prior to decedent's death, and the bonds had no value in and after April 1938. Knights of Columbus Building Association of Paducah bond, dated June 1, 1934, in the amount of $50. 115 share of Corporation Security Company, dated January 12, 1932, without value at the time of decedent's death. Note excuted by L. A. Graham on June 12, 1934, payable to decedent on demand in the amount $500of. Note executed by E. G. Swift on October 26, 1936, payable to decedent on demand in the amount of $80. Note executed by Arch R. Allen on June 22, 1936, payable to decedent on demand in the amount of $400.66. Letter dated August 13, 1931, transmitting 10 shares of Class B preferred stock of the Northern Utility Company issue in the name of the decedent. The notes had no value at the time decedent died. Opinion The petitioner alleges that assessment of *45 the deficiencies for all of the taxable years is barred by the statute of limitations. The respondent relies upon his charge of fraud for the timeliness of the notice of deficiency for the taxable years 1941 to 1944, inclusive and a consent agreement for the taxable period in 1945. Consideration will first be given to the years in which respondent contends fraudulent returns were filed with intent to evade tax. The deficiencies have a presumption of correctness and petitioner has the burden of overcoming the determinations. No such presumption exists with respect to the fraud issue. Any failure of proof on the part of the petitioner to show error in the deficiencies does not relieve the respondent of the burden of proving by clear and convincing evidence that in each of the taxable years all or part of the deficiency is due to failure to report taxable income with fraudulent intent. ; ; affd., ; ; ; affd., ; ; *46 affd., ; . The basis for the deficiencies and resulting proposal of fraud is a net worth statement computed by starting with assets reported in the return filed by the petitioner for the estate of the decedent. The use of the method for determining taxable income is not questioned by the petitioner. The real difference between the parties concerns the accuracy of the statement. To determine the taxable income of a taxpayer by the method applied here, it is essential that the net worth computed for the beginning of the taxable period be reasonably accurate in order to determine his taxable income in succeeding years. Any increase in net worth at the starting date would correspondingly decrease income in subsequent taxable years. The disagreements on the opening net worth statement relate primarily to amounts omitted therefrom. Nothing was allowed for the decedent's one-half interest in the bank balance of $1,269.64 of the partnership or the annuity which the decedent's returns showed had been purchased at a cost of $4,000. No credit was given for the Paducah Ice Company and Greystone Hotel bonds of a total face *47 amount of $1,500 We are not aware of the value of the bonds. Any deficiency in the proof in that regard operates against the respondent on the fraud issue and not in favor of him. Aside from the bank balance, no amount was allowed for the decedent's interest in the partnership, even though respondent included in his computation for 1945 an amount for proceeds of sale of stock which the partnership purchase in 1928 or 1929. After the death of the decedent, $32,183.25 in cash, of which $141.25 was in gold coins, was found in his safe deposit box which he maintained continuously after January 1, 1936, and had opened at some undisclosed time prior thereto. The revenue agent treated all of the amount as income realized in 1945, but the conferee, to avoid taxation of the entire amount in that year, credited the starting net worth with the amount of the gold coins and divided the other cash among all of the taxable years except 1943, for which year he allocated $1,841.85 less than to the prior year. It does not appear that the respondent altered the conferee's adjustment in his determination of the deficiencies. There is no proof of the source of the safe deposit money or when it was *48 deposited therein. The allocation made by the respondent excludes all possibility that some part of it could have been in the box at the close of 1940, an illogical assumption in the light of the employment record of decedent, the nature of his business, in the conduct of which large sums of cash were required, and his admitted frugality. If it were proper for the respondent to assume, as he must have, that the gold coins were in the box on January 1, 1941, without, as here, distinguishable facts, logic would require a conclusion that at least some part of the $32,042 of other cash was in the box at the same time. The starting net worth statement allowed only $341.36 for cash on hand at the close of 1940. The inference here is that decedent had many times more than that amount. The respondent increased decedent's net worth about $61,000 to the close of 1944, an average of about $15,250 per year. Substantially all of the total increase is attributable to increases in bank balances, bonds, real property, uncashed interest coupons and cash found in the safe deposit box. He allowed only about $12,000 for accumulations prior to 1941, an average of about $400 a year after 30 years of *49 full time employment, 13 of which as a member of the partnership. Respondent attempts to bridge the wide discrepancy by contending that returns filed prior to 1941 and inferences to be drawn for years for which no returns were filed, preclude any conclusion that the difference in the amounts could have been saved. His argument is based, in part, upon alleged proof that no returns were filed prior to 1920 and that the decedent had no dependents. The evidence contains no proof that returns were not filed prior to 1920 and it shows that decedent supported his mother from 1914 until her death in 1926 or 1927. Thus the contention has no firm foundation. The partnership kept records of its operations and without evidence establishing otherwise, we are not warranted in saying that they were not kept with reasonable accuracy. It is true that some of the records applicable to returns of the decedent for the taxable years were destroyed prior to the examination conducted in April 1948, by a revenue agent, but he did not examine such records as were available to him and testified that he had no recollection of inquiring about the existence of records. Some of the records were present during *50 the hearing, but no offer was made to make them a part of the record. Failure to introduce them does not operate against petitioner, for he was under no duty to make a case for the respondent. Further discussion of the issue would serve no useful purpose. We conclude from all of the evidence that the respondent has failed to discharge the burden of proof imposed upon him by statute. So concluding, assessment of the deficiencies for the years 1941 to 1944, inclusive, is barred by the statute of limitations. The respondent relies upon a consent agreement for the timeliness of his notice of deficiency for the taxable period in 1945. The petitioner relies upon lack of proper pleading and proof of a waiver as a defense. The petitioner alleged in his petition that assessment of the deficiency was barred by the provisions of section 275 (a) of the Code, which permit assessment within three years after the return was filed. The allegation was denied by the respondent in his answer, which alleged fraud for all years even though no fraud penalty was asserted for 1945. He also alleged that assessment was permissible under the provisions of section *51 276 (a) which authorizes assessment at any time if the return was false or fraudulent with intent to evade tax. His prayer was that the determination be approved as made by him. A short time after the commencement of the hearing and while petitioner was on the witness stand, counsel for the respondent announced that if his pleading could be construed to ask for the determination of a fraud penalty for 1945, he waived it, and, in effect, that he was relying upon a consent to extend the statute beyond the date of mailing of the notice of deficiency. After the hearing, respondent moved in writing to amend his answer to allege the execution of the consent and his motion was granted and the amendment made. The limitation issue was placed in issue by the petition and answer. While the respondent alleged in his answer that he was relying upon fraud as an exception to the general rule, the penalty was not imposed for 1945 or placed in issue. Any doubt that was created by bad pleading was cured by a timely announcement at the hearing by counsel for the respondent, to clarify the record, that no fraud penalty was involved and, in effect, that he was relying upon a consent agreement placed *52 in evidence with the return for 1945 to extend the three year period of limitation. Thus petitioner and his counsel had timely notice of respondent's ground for defense and are in no position to claim surprise. They had ample opportunity to meet the issue as so framed. Any defects in respondent's pleading were corrected by an amended answer, assuming that an offer of a waiver would not be within the scope of the limitations issue as raised by the petition and answer. See ; affd., ; ; . Aside from alleged inadequate pleading by respondent, petitioner contends that no proof was made of the execution of a waiver to extend the limitations period, as alleged. The return filed by the petitioner for 1945, with the consent agreement attached to it, was placed in evidence without objection. A short time thereafter counsel for the respondent "To clarify * * *" any misunderstanding about the pleadings, announced that for the period in 1945 to the date of death of the decedent a deficiency in tax was determined, but no penalty. Counsel *53 for the petitioner then stated, "* * * for the purpose of clarification of the record, * * *" that the answer alleged fraud for all years, to which respondent's counsel replied that if it could be so construed, he was waiving the claim. The query of petitioner's counsel concerning the statute of limitations was answered by counsel for the respondent by saying that "'45 has a waiver attached to the return. We can attach that if you wish", and at the end of the discussion, "So, can I state for the record, with your agreement, that the year 1945 is open without penalty for the reason that there is attached to the return an executed consent fixing period of limitations upon assessment of income tax to June 30, 1950; and the statutory notice was mailed prior to that time", to which the reply of the Court was "All right". No lack of agreement with the proposal was noted by petitioner's counsel. If petitioner's counsel was not aware that the consent was not submitted in evidence with the return for 1945, he was apprised of the fact and given notice that the respondent was relying upon it to extend the three-year statutory period of limitations. Failure of counsel to deny agreement with *54 the respondent on the matter or register any protest when the subject was under discussion, infers that he was in accord with respondent's views. Under the circumstances, we conclude that the consent is before us as evidence. The consent was entered into within the limitation period of three years, and extended the statute to June 30, 1950. The notice mailed on July 7, 1949, was timely and assessment of any deficiency for the taxable period in 1945 is not barred. The deficiency determined for 1945 resulted entirely from the inclusion in gross income of $18,814.55, representing the difference between the decedent's net worth, plus cash expenditures, etc., on the date of death, amounting to $24,367.52, and at the beginning of the year as computed by the respondent, less the net income of $5,552.97 reported in the return for that period. The amount of $24,367.52 was computed as follows: Increase checking account
$ 488.58
Safe deposit box cash (allocated)
16,860.04
Cash in pocket
1,530.00
U.S. Bond purchases
750.00
Uncashed coupons on U.S. Bonds
362.50
Cash due from partnership opera-
tions
3,291.70
Mortgage notes
(331.65)
Partnership checking account
(816.33)
Living expenses, insurance premi-
ums, Federal income tax, etc.
2,232.68
Total
$24,367.52
*55 The failure of proof on the part of respondent under the fraud issue does not in any wise relieve petitioner of his burden to overcome the presumption that the several amounts constitute taxable income. Respondent concedes that the amount should be reduced because of a deplication of $1,530. The uncashed interest coupons on the bonds are clearly taxable income and the parties stipulated that the item of $3,291.70, which includes the duplicated figure, represents cash due the decedent at death from partnership operations. Most of the remaining amount is represented by the portion of the safe deposit cash determined to constitute taxable income. It is not known when the money was placed in the box or the amount of $1,530 put in decedent's pocket. Probability that it was so placed before 1945 is no greater than that the money was earned in that year. Any conclusion on the point would be mere speculation, a course in which we are not required to indulge, the burden of proof being on petitioner. Without facts demonstrating by the degree of proof required of petitioner that the money was not earned as taxable income in 1945, there is no alternative but to find for the respondent in an *56 amount which gives effect to respondent's concession above noted. Detailed discussion of the other items, the amount of each of which is not in dispute, is unnecessary. It is sufficient to say that because of lack of proof that they do not constitute taxable income, the determination of the respondent may be sustained. Decision will be entered under Rule 50. Footnotes
1. Bets taken from other bookmakers when they consider that they have too much money on a horse.↩
2. Deposits and withdrawals were entered on a slip of paper kept apart from regular bank accounts and when the sheet became full the balance was transferred to another sheet and the old one destroyed.↩
3. The corporations went into bankruptcy at some undisclosed time. ↩
4. The stock held by the partnership when the decedent died.↩